IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GENERAL ENGINEERING AND
TECHNICAL SUPPORT SERVICES, *et al.*,    *

    Plaintiffs,    *

  v.    *    Civil Action No. 8:18-cv-00124-PX

BALTIMORE GAS AND ELECTRIC., *et al.*,    *

    Defendants.    *

                              ***

## MEMORANDUM OPINION

This case presents allegations of race discrimination and a 100 million-dollar damages claim untethered to provable facts. Plaintiff General Engineering and Technical Support Services (GETSS), a registered and certified Maryland Department of Transportation Minority Business Enterprise (MBE), along with individual Plaintiffs Herbert Fuller and Walter Fuller (Fuller Brothers) and GETSS (collectively Plaintiffs) bring suit against ICF and BGE (collectively Defendants), arising from a contractual arrangement never consummated. Plaintiffs specifically allege that Defendants discriminated against them in the offer and withdrawal of a services subcontract, in violation of 42 U.S.C. § 1981. ECF No. 1. Plaintiffs also bring companion claims for retaliation and promissory estoppel.

Pending before the Court is Defendant Baltimore Gas and Electric's (BGE) and Defendant ICF Consulting Group's (ICF) motion for summary judgment (ECF No. 61) and motion for sanctions. ECF No. 52. The motions are fully briefed, and no hearing is necessary. See Loc. R. 105.6. For the following reasons, Defendants' motion for summary judgment is GRANTED and Defendants' motion for sanctions is DENIED as moot.

## I. Background

BGE is a subsidiary of Constellation Energy that serves gas customers and business and residential electric customers in parts of Maryland. ECF No. 1 ¶ 11; ECF No. 10 ¶ 11. In April 2008, Maryland enacted legislation to reduce energy consumption across the state. ECF No. 1 ¶ 9; ECF No. 8 ¶ 9; ECF No. 10 ¶ 9. In response, BGE implemented a suite of energy efficiency programs to provide residential and commercial customers with energy and cost saving opportunities. ECF No. 1 ¶ 14; ECF No. 10 ¶ 14. BGE selected ICF to administer these programs, including the Quick Home Energy Check-ups (QHEC) Program. ECF No. 1 ¶ 15; ECF No. 10 ¶ 15. The QHEC Program educates homeowners on how to manage their energy use and identify energy efficiency opportunities in their homes. ECF No. 61-4. During a QHEC, a contractor visually inspects homes and recommends to homeowners ways to make their homes more energy efficient. *Id.*

ICF uses subcontractors to administer the QHEC Program selected through an annual Request for Proposal process. ECF No. 1 ¶¶ 15, 17, 21; ECF No. 8 ¶¶ 15, 17, 21; ECF No. 61-4. During this process, ICF solicits three categories of QHEC subcontractors: Traditional Single Family, Multi-Family, and Lead Generation. ECF No. 61-6. Traditional Single-Family subcontractors provide QHECs for single-family units and receive program-generated leads based on assigned zip codes. *Id.* Lead Generation subcontractors pursue self-generated leads and promote QHECs through channels missed by the Program's other marketing efforts. *Id.* Multi-Family Only subcontractors provide QHECs for multifamily communities also through self-generated leads. *Id.*

On October 31, 2014, GETSS responded to ICF's Request for Proposal to become a subcontractor for the 2015 QHEC Program. ECF No. 1 ¶ 35; ECF No. 8 ¶ 35; ECF No. 10 ¶ 35;

ECF No. 61-7. GETSS is a registered and certified MBE, managed by the Fuller Brothers. ECF No. 1 ¶ 7; ECF No. 61 ¶¶ 12, 13. ICF selected GETSS as one of three Lead Generation subcontractors because of GETSS' connection to "untapped markets such as low-income housing organizations, superchurches and other religious affiliates." ECF No. 61-6. The other two selected Lead Generation subcontractors, BED&R and greeNEWit, are not MBEs. *Id.*

ICF informed GETSS via email of its selection as a Lead Generation subcontractor on November 21, 2014 for calendar year 2015. ICF also informed Plaintiffs that it would forward a subcontract agreement upon GETSS accepting the email offer. ECF No. 61-8. GETSS responded affirmatively to ICF's email four days later. *Id.*

In December 2014, before sending GETSS the subcontract, ICF conducted a subcontractor training and orientation, instructed GETSS to put together a provisional operating budget of $20,000 for interim work pending execution of the formal subcontract, and provided to GETSS an online scheduler and employee badges to use for the QHECs. ECF Nos. 62-43, 62-28, 62-46, 62-49. On March 13, 2015, ICF sent GETSS its standard subcontract agreement with an initial budget of $19,952 (the "Proposed Subcontract"). ECF No. 61-10 at 3. On March 19, 2015, Plaintiffs requested clarification as to the time frame covered for the budgeted amount, which ICF clarified as quarterly. *Id.* at 1–2. Ultimately, GETSS never signed the Proposed Subcontract. *Id.*; ECF Nos. 61-11, 61-12.

Despite having no formal subcontracting agreement, Plaintiffs informed ICF via email on April 3, 2015 that they intended to bill ICF "for the loss in productivity our company suffered during the first quarter as a result of delays and negligence caused [by]…your organization." ECF No. 62-43. Plaintiffs attached to the email an invoice totaling $105,000 for February 1, 2015 through March 15, 2015. *Id.* at 6. This invoice reflects that Plaintiffs did not conduct any

QHECs, but nonetheless tallied expenses related to "6 weeks of work lost." *Id.*

On April 27, 2015, ICF notified Plaintiffs by email that it withdrew the Proposed Subcontract. ECF No. 61-13. Plaintiffs responded that they would "be sending invoices from April 1st through April 30th 2015, and through the entire program period which ends in December 2015." ECF No. 61-14. On May 8, 2015, Plaintiffs emailed BGE, summarizing a conversation from the previous day in which Walter Fuller informed BGE that ICF engaged in "discrimination." ECF No. 62-63. On June 3, 2015, Plaintiffs, by email, also accused ICF of engaging in "unethical, biased, discriminatory, corrupt, and unlawful practice[s]." ECF No. 61-15. Plaintiffs ultimately submitted invoices to ICF for July through December 2015, totaling hundreds of thousands of dollars. ECF No. 61-16. ICF never paid on any such invoices.

On January 12, 2018, Plaintiffs filed suit in this Court against Defendants, alleging claims of promissory estoppel and race discrimination and retaliation under 42 U.S.C. § 1981. ECF No. 1. After a protracted discovery period due largely to Plaintiffs' lack of diligence and difficulties with counsel, the Fuller Brothers currently proceed pro se. ECF Nos. 25, 31, 48.

On March 15, 2019, after Plaintiffs failed to comply with this Court's discovery Order, Defendants moved for sanctions, arguing that Plaintiffs acted in bad faith and with callous disregard for the authority of the Court. As relief, Defendants request that the Court to dismiss the case with prejudice or alternatively to preclude use of nondisclosed evidence at trial or in dispositive motions. ECF No. 52. On June 7, 2019, Defendants moved for summary judgment, incorporating by reference the sanctions motion. ECF No. 61.

## II. Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the

4

movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

### III.     Discussion

#### A. Promissory Estoppel (Count I)

Defendants contend that summary judgment on this Count should be granted in their favor because Plaintiffs have failed to generate any evidence supporting the claim. ECF No. 61 at 9–11. Promissory estoppel provides an avenue for contractual relief in the absence of a formal agreement. *Horlick v. Capital Women's Care*, LLC, 896 F. Supp. 2d 378, 396 (D. Md. 2011) (*quoting Md. Transp. Auth. Police Lodge # 34 v. Md. Transp. Auth.*, 195 Md. App. 124,

5

215 (2010)). To prevail, a plaintiff must show (1) a clear and definite promise; (2) the promisor's reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) inducing actual and reasonable action or forbearance by the promisee; and (4) to the promisee's detriment that can only be avoided by the enforcement of the promise. *Sedghi v. PatchLink Corp.*, 440 F. App'x 165, 168 (4th Cir. 2011) (citing *Pavel Enters. v. A.S. Johnson Co.,* 342 Md. 143 (1996)). "A clear and definite promise . . . is one that reasonably defines the contours of the action or forbearance*." McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362, 373 (D. Md. 2005).

Although genuine disputes of fact exist regarding whether ICF made an actionable promise to Plaintiffs, no evidence exists that Plaintiffs were induced into reasonable action or forbearance. ECF No. 62-3 at 70. As to evidence of a promise, ICF plainly conveyed to Plaintiffs that it would send over a subcontract agreement "[u]pon [GETSS's] acknowledgement and acceptance of this offer" to work as an ICF subcontractor, and instructed Plaintiffs to "operate on the following budget figures" of $20,000 "for Q1 2015 until your company receives an official contract." ECF Nos. 61-8, 62-28. ICF further requested that GETSS' technicians "meet a goal of $210 average cost per unit," to vary depending on customer needs. ECF No. 62-8. ICF also provided (or attempted to provide) GETSS login credentials for an online scheduler and an orientation for subcontractor representatives. ECF Nos. 62-46, 62-43. Based on this evidence, a reasonable fact finder could conclude that ICF made an actionable promise to retain Plaintiffs as a Lead Generation subcontractor.

However, the record evidence viewed most favorably to Plaintiffs fails to demonstrate that Plaintiffs did anything in reliance on this promise. The promise, at base, was for ICF to pay GETSS for performing QHECs in its capacity as Generation Lead. No evidence exists that

Plaintiffs performed any work consistent with this promise or even attempted to perform work for which it now seeks reimbursement. Although Plaintiffs baldly allege they suffered "losses" totaling an astounding $155,149,650.88, ECF No. 62-39, Plaintiffs provide no evidence that any such losses arose from GETSS attempting to perform consistent with ICF's promise for work. Nor do the invoices for "lost work" based on an inscrutable metric support Plaintiffs' claim. Unmoored to any factual basis or legal theory, the claim must fail. ECF No. 62-39. *See Mansfield v. Kerry*, No. DKC 15-3693, 2016 WL 7383873, at *2 (D. Md. Dec. 21, 2016) (finding that although a pro se party is "given some latitude," he may not avoid summary judgment by "relying on bald assertions and speculative arguments") (citing *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 249–50 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted). Defendants' motion as to the promissory estoppel claim is granted.

### B. Discrimination Claims pursuant to 42 U.S.C. § 1981 (Count II)

Defendants next contend that Plaintiffs' discrimination claims also fail as a matter of law. Section 1981 prohibits race discrimination in the making and enforcement of private contracts. *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001); *see* 42 U.S.C. § 1981(a). Under § 1981, "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S. C. § 1981(b). To succeed on a § 1981 claim, a plaintiff must demonstrate that the defendant intentionally discriminated against the plaintiff because of his race and during the course of the contractual relationship. *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006).

Where plaintiffs are unable to present direct evidence of discriminatory intent, their claims are subject to the *McDonnell Douglas* burden-shifting framework. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination with evidence demonstrating that (1) the plaintiff is a member of a protected class; (2) who sought to enter into a contractual relationship; (3) the plaintiff met the requirements needed to enter into such contract; and (4) was denied a contractual agreement that was available to members outside the protected class. *Obeya v. British Sch. of Washington*, 2004 WL 3090210, at *3 (D. Md. 2004), *aff'd*, 104 F. App'x 300 (4th Cir. 2004) (citing *Murrell*, 262 F.3d at 257). If the plaintiff makes a prima facie case, the burden then shifts to the defendant to produce evidence that defendant acted with a legitimate, nondiscriminatory reason. *Staples*, 372 F.3d at 667. If defendant meets its burden of production, the burden shifts back to the plaintiff to show that the proffered legitimate reason was mere pretext and that race was the real reason for the less favorable treatment. *Id.*

Defendants first argue that the Fuller Brothers, as mere agents of GETSS, cannot pursue a § 1981 discrimination claim because only GETSS, as the contracting party, may bring the cause of action. ECF No. 61 at 10–11. It is well settled that "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes to make and enforce." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006) (internal quotations omitted). The United States Supreme Court in *Domino's Pizza* squarely held that an individual shareholder and agent of a corporation alleging discrimination in the making or execution of a contract cannot pursue a claim on his own behalf. *Id.* Looking to fundamental principles of agency and corporate law, the Court reasoned that "shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's

8

contracts." *Id*. at 477. Thus, the individual shareholder simply cannot state a claim under section 1981. This is so even where the individual shareholder was an "actual target" of discrimination and is actually injured by the impairment of the contract. *Id.* at 478.

The majority of Circuits, including the Fourth, have similarly denied to individuals the capacity to sue for a section 1981 claim on behalf of a corporation. *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 348 (4th Cir. 2013) (individual principals for LLC no right to sue for discriminatory contract claim on behalf of corporation); *Beasley v. Arcapita Inc.,* 436 F. App'x 264, 266–67 (4th Cir. 2011) (African American shareholders of franchise could not bring a § 1981 action arising from franchise agreement); *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 14 (1st Cir. 1999) (corporation could pursue § 1981 claim for discriminatory contract claim, not minority owner and sole shareholder); *Gersman v. Group Health Ass'n Inc.*, 931 F.2d 1565, 1567–68 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992) (same). This overwhelming authority compels the same result here.

The § 1981 discrimination claim exclusively concerns the Proposed Subcontract to which GETSS and ICF were parties. Any impairment to the contractual relationship actionable under § 1981 is as to GETSS. The Fullers, who were not parties to the contract, and for whom no evidence supports that they maintained any rights or liabilities under the contract, simply cannot pursue the claim. Thus, summary judgment in favor of Defendants as to the Fuller Brothers is warranted on this ground alone.

Alternatively, even if the Fuller Brothers could somehow demonstrate suit is proper as to them, the record evidence viewed most favorably to Plaintiffs simply fails to sustain a § 1981 discrimination claim on the merits.[1] Although Plaintiffs generally aver that Defendants

---

[1] GETSS is without counsel and has filed no opposition to Defendants' summary judgment motion. However, for the reasons discussed as to the merits of the claims, summary judgment is granted in favor of Defendants as to all

"interfered with Plaintiff[s'] ability to make or enforce a contracts [*sic*]; based upon its status as a Minority Owned Business Enterprise," ECF No. 1 at ¶ 97, no evidence supports this allegation.

First as to the prima facie case, no evidence exists that ICF denied GETSS any contractual term or provision that was otherwise extended to a similar entity outside the protected class. Rather, the record shows that ICF offered GETSS a standard subcontract also extended to similarly situated Lead Generation subcontractors. ECF No. 61-10. For example, ICF extended a near identical subcontract to a non-MBE, greeNEWit, one of the two other Lead Generation subcontractors. ECF No. 61 ¶ 20; ECF Nos. 61-6; ECF No. 61-9; ECF No. 61-10. ICF also granted a provisional budget to greeNEWit of $18,792, approximately 6% less than the $19,952 initial budget offered to GETSS for similar services. *Compare* ECF No. 61-9 at 1 *with* ECF No. 61-10 at 4. Accordingly, on this record, Plaintiffs cannot establish that they were denied any contractual terms or benefits on account of race.

Moreover, the record evidence viewed most favorably to Plaintiffs reflects that ICF withdrew the Proposed Subcontract for legitimate, non-discriminatory reasons. On March 13, 2015, ICF sent GETSS the Proposed Subcontract for signature. ECF No. 61-10 at 3. On March 19, 2015, GETSS requested clarification on the budgeting periods, which ICF clarified over email and by updating the agreement. *Id.* at 1–2. Yet GETSS never signed the updated agreement. *Id.*; ECF No. 61-11; ECF No. 61-12. ICF, in response, withdrew the offer. ECF No. 61-13.

Perhaps more to the point, no record evidence demonstrates the withdrawal was motivated by racial animus. Although Plaintiffs recite a parade of horribles[2] that they contend

---

Plaintiffs, including GETSS.

[2] Although it stretches credulity to understand why Defendants would, at once, extend the subcontracting offer and then take steps to sabotage it as Plaintiffs contend, none of the allegations give rise to an inference of discrimination. Even if the Court accepts as true that ICF issued "false login credentials to an online scheduler," withheld employee

thwarted their ability to ever perform on the contract, nothing suggests that these impediments had any connection to their status as an MBE. Defendants are thus entitled to summary judgement on Plaintiffs' § 1981 claim.

### C. Retaliation (Count III)

Defendants similarly contend that Plaintiffs § 1981 retaliation claim fails because no evidence exists that Plaintiffs engaged in any protected activity prior to ICF's adverse action. The court agrees.

To sustain a §1981 retaliation claim, a plaintiff must demonstrate that it (1) engaged in protected activity such as lodging complaints regarding discriminatory conduct; (2) that the defendants took adverse action against the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). Quite obviously, to satisfy the causality prong, a plaintiff must demonstrate the protected activity occurred *before* the defendants took any adverse action. *See Ford v. Gen. Elec. Lighting, LLC*, 121 F. App'x 1, 7 (4th Cir. 2005); *Causey v. Balog,* 162 F.3d 795, 803–04 (4th Cir.1998). Otherwise, the plaintiffs simply cannot show that the adverse action had anything to do with the complaints. *Id.*

The record evidence viewed most charitably to Plaintiffs show that twice Plaintiffs complained about having been the victims of discrimination in May 8, and June 3, 2015 emails to BGE and ICF. But the emails were sent weeks, if not months, *after* ICF took any adverse

---

badges, delayed approval of GETSS's marketing materials, and offered GETSSs "the lowest overall budget" for the QHEC Program, ECF Nos. 62-3 at 72-73, 62-49, 62-50, no evidence exists that these snafus were fueled by racial animus. Plaintiffs' repeated bare allegations that other subcontractors outside their protected class were more favorably treated, *see, e.g.* ECF No. 62-8, are insufficient to generate a genuine dispute of material fact. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir.2013) (finding that to survive summary judgment, the nonmoving party "cannot solely rely on mere allegations" but "must set forth specific facts that go beyond the mere existence of a scintilla of evidence") (internal quotation marks omitted).

action against them.[3]  ICF initially sent the Proposed Subcontract to GETSS on March 13, 2015 and the revised Proposed Subcontract on April 8, 2015.  ICF next withdrew the Proposed Subcontract on April 27, 2015.  ECF Nos. 61-10, 61-13.  Because Plaintiffs protected activity occurred before Defendants took adverse action, the retaliation claim fails as a matter of law.  Defendants' motion on the § 1981 retaliation claim is granted.

### IV. Defendants' Request for Sanctions

Defendants move for sanctions to address Plaintiffs' repeated discovery violations.  ECF No. 52 at 1–2.  Defendants seek dismissal of the claims or alternatively an order precluding Plaintiffs from raising certain claims or introducing evidence not timely produced.  Defendants also request award of reasonable attorneys' fees.  ECF No. 52 at 11; ECF No. 62 at 15.

The record plainly reflects Plaintiffs' chronic dereliction during discovery and refusal to comply with this Court's orders.  This Court has previously found that Plaintiffs "largely, if not wholly, abandoned their discovery obligations" and thus ordered them to supplement their deficient responses and answers that had been outstanding for months.  ECF No. 39 ¶ 4.  The Court also warned Plaintiffs that "[a]ny failures to adhere to discovery deadlines or to produce complete and accurate responses or answers will result in appropriate sanctions, including but not limited to monetary penalties, adverse evidentiary rulings, preclusion of issues and defenses, dismissing the action, default judgment in Defendants' favor, and contempt findings."  ECF No. 46.  Despite these warnings, Plaintiffs never fully responded to discovery.  ECF No. 52-1.

Plaintiffs' repeated refusal to adhere to this Court's orders to provide timely and

---

[3] Plaintiffs in their response to Defendants' summary judgment motion also broadly assert that "sometime in September 2014," they "called and complained" to ICF and BGE about "discriminatory selection practices."  ECF No. 62-3 at 1.  Plaintiffs have supplied no details as to the time, place or substance of these supposed calls, and no record evidence supports this contention.  Further, even if somehow Plaintiffs could demonstrate that they lodged such complaints, they were *awarded* a subcontract a month later.  A reasonable fact finder would be hard pressed to find that ICF retaliated against Plaintiffs for complaining in September by conferring on them the benefit of the Lead Generation subcontract.

complete discovery warrants sanction. At a minimum, the Court finds that granting Defendants' motion for attorneys' fees appropriate. Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure confers on this Court power to order the party who has failed to comply with discovery "to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Defendants have been forced to expend significant resources litigating Plaintiffs' discovery violations, all of which have been decided in Defendants' favor. Had Plaintiffs simply followed the rules, all such expenses would have been avoided. Nor can Plaintiffs contend that changes in counsel excuse their discovery deficiencies because the Court had granted reasonable extensions to accommodate change in counsel.

Accordingly, the Court orders that Plaintiffs will pay Defendants' attorneys' fees and costs associated with preparing, filing, and participating in any recorded conference in connection with (1) the February 19, 2019 pre-motion letter (ECF No. 42) and (2) motion for sanctions (ECF No. 52). Within fourteen days from the date of this Opinion and accompanying Order, Defendants shall itemize all reasonable attorneys' fees consistent with this ruling. Because the Court has granted summary judgment in favor of Defendants on the merits, the request for dismissal of claims or for evidentiary rulings adverse to Plaintiffs is denied as moot.

**V.     Conclusion**

For the foregoing reasons, the Defendants' motion for summary judgment (ECF No. 61) is GRANTED. Defendants' request for sanctions (ECF No. 52) to address Plaintiffs' discovery violations is GRANTED as to the award of attorneys' fees and DENIED as moot in all other respects. A separate Order follows.

08/26/2019                                                    /S/
Date                                                          Paula Xinis
                                                              United States District Judge